Good morning, your honors. My name is Arthur Weed, and I'm the attorney for Michael Leinweber. That's how I pronounce it, but I've never heard it pronounced, so perhaps you're right about that. In any case, this is a murder case that arose in the state courts in Modesto, California. And what happened was Mr. Leinweber learned that someone had borrowed his car, and he was very unhappy with that. And so he went outside with a gun in his hand and ordered the person out of the car. When that person returned the car, there was a young lady sitting in the passenger seat with whom he had no car on. But what happened was the gun went off and the young lady was killed. Mr. Leinweber took the stand and said, well, I never meant to kill her. It was a complete accident that the gun went off, and that was his only defense at the trial. The jury, however, found him guilty of first-degree murder, and he appealed to the California Court of Appeal, raising the issues that this Court has certified for appeal, namely the question of did the prosecutor commit misconduct during Leinweber's trial. And the first instance of misconduct which the Court of Appeal of Division V in California law relating to involuntary manslaughter, which is what Leinweber was admitting that he was guilty of, and asking that the jury would find him guilty of rather than first-degree murder. Did the prosecutor misstate that law? Now, the law is that you can't be found guilty in California of involuntary manslaughter if the act that you did that led to the killing was, quote, inherently dangerous to human life. And there are, of course, a number of acts that fall in that category, but California has held that being a felon in possession of a weapon is not such an act. Now, the Court of Appeal noted that during his closing argument, the prosecutor never did say that being a felon in possession was such an act. In other words, he never claimed that it was inherently dangerous to human life. What he did claim, though, and here I'm referring to page 11 of the Court of Appeal's decision, which is quoted in volume one of the excerpt's record, and I'll read from the bottom of page 11 of the Court of Appeal's opinion, after defense counsel claimed the prosecutor's argument that Leinweber loses all right to commit an involuntary manslaughter was not the law, the prosecutor argued it was for the jury to decide, and so on. And then the opinion goes on to state at the very bottom, as summed up by the prosecutor, and then they quote, and this is a quote from the transcript to the trial, the closing argument, he did a lot of crimes that day, but what we're talking about here is murder, and he was also committing a felony as being a felon in possession when he committed the murder, and that kicks him out of the involuntary manslaughter. Now, that would not kick him out of involuntary manslaughter. But the Court did give the proper instruction, did it not? Yes, Your Honor, it did, but it refused a defense-crafted instruction that said right on the money that a defendant can be convicted of involuntary manslaughter and have been a felon in possession at the time. The trial court refused that instruction. But the other instructions did, in fact, say that he could be convicted of involuntary manslaughter. That's correct. But what I'm saying here is that the error that my client is complaining of is that he crafted a pinpoint instruction that highlighted his defense, namely it was an accident, and said it is not true, as the prosecutor has said, that simply by being a felon and having a weapon, which is a violation of California law, he was no longer eligible for involuntary manslaughter. The trial judge refused that instruction. And the reason I raise that before this Court is that this circuit has held that failure to give an instruction which pinpoints the defendant's theory of the case can never be harmless error. It is reversible per se. And I state that at page 17 of my opening brief. Now, the other claimed instance of misconduct, which I think is more important and, to my way of thinking, more egregious when we look at the grand scale of things, is that the prosecutor suggested that the various witnesses that were called by the defendant during his portion of the trial had been told what to say by defense counsel. In other words, defense counsel had suborned perjury. And what happened is the court of appeals said, we don't think so. What they said at page 13 of the opinion is, assuming there was error, meaning, wait a minute, I'm referring to the wrong thing. Let's go to page 14 of the court of appeals opinion. It says, a review of the record reveals no prejudicial misconduct on the part of the prosecutor. And the opinion outlines eight or nine different claimed instances of misconduct. And I have to admit that when I read them, I thought, well, this really isn't so bad. I mean, that was my opinion. But then I read the transcript, and I read the entire transcript of the trial, which took over a month in this case. And in my opening brief, there are ten pages that I have coded that apparently never came to the attention of the court of appeal. So what I am saying here is that this is a situation to get past the ADPA gatekeeping provisions that we're all familiar with, where the court of appeal misapplied the facts of this case, the facts of this case being what the prosecutor actually said during closing argument, rather than what a witness said or evidence that was otherwise introduced. And the case that I have cited to this court, which I think is, as far as this court is concerned, the controlling case, is Bruno v. Russian, which I cite at page 32 of my opening brief. And quoting from that case, this court found that there was prosecutorial misconduct, where the district attorney said, and I will read from the case, and this is what the district attorney said. Now, after that statement was given, a lot of events started taking place. I'm reading from the opinion here. All of a sudden, lawyers started getting involved in the case, and the next thing you know, the following day when the witness comes in to testify, all of a sudden, everything got turned around, and that's no longer the case. Now, I quote from the transcript of Lean Weber's trial on page 24 of my opening brief, and again, I'll read from the transcript that is quoted on page 24 of the brief, looking at the bottom of the page. Before she talks to Mr. Wildman, who was defense counsel here, she's very clear that she did not know anything about an accident. And keep in mind that the defendant's theory was that it was an accident that this unfortunate young woman was killed. That was an accident. That was not what he intended. But the prosecutor said, before she talks to Mr. Wildman, she's very clear that she did not know anything about an accident. She said that because she didn't think the defendant would do something like that. Then she talks to Mr. Wildman, and then we have all this detail about an accident, about the changing of the hand, and stuff that was never said before. Okay? And there are a total of ten pages like that, where the prosecutor disparages the lawyer saying that this is unethical, it's improper, he's suborn perjury. Basically, what I respectfully suggest here is that we have a situation that is worse than Bruno, or more egregious, if you will, and that this Court should regard this matter in reference to its supervisory authority over the lower courts, which is granted to this Court for a very good reason. And that is that this Court alone has the authority to prevent rampant corruption in the judicial system. There's no one else that can do that. President Obama can't do it. Congress can't do it. Well, the California Court of Appeals could do it. Could have done it. Could have done it and did not do it. That's why we're here today. They said we find no misconduct, and then the incidents that they cited are relatively minor compared to the ones that I unearthed. And that's why I'm suggesting they misapplied the facts. Well, was it harmless error, these statements? I suggest that that is not a consideration in this case, and I'll tell you why. Because wasn't there considerable evidence? Okay. This is why. If you consider what is happening in Mexico today, and I apologize to the Court for digressing like this. In Mexico? In Mexico. That Mexico has had more people killed during what has to be considered a civil war between the drug cartels and the government. They've had twice as many people killed as America had servicemen killed in Vietnam. In other words, what's happening in Mexico is worse than anything we have seen in this country. And I suggest we never will see it, and that's because this Court isn't going to allow this type of thing to go on in this country and for our judiciary system to suffer the corruption that's spiraled out of control in Mexico. It's as simple as that. And I think that if you consider what it is that happened here, it's not as bad as what's happening in Mexico, but it is prosecutorial misconduct, and it falls to this Court to disapprove of it in a way that is not going to be popular. Well, I appreciate that, I think. But if you take that – I guess if we take out the statements, wouldn't the evidence here have been overwhelming against your client? I don't know the answer to that. I don't believe that that's the question, though. The question is, was he denied due process rights? Was the trial fundamentally unfair on account of what the prosecutor did? Well, no. My question was, did the statements cause – I mean, as a result, was it harmless error? I mean, so was there enough evidence there despite these what I consider very egregious statements by the prosecutor? But if we carve that out, wasn't there a pretty substantial case against your client? I mean, he shot a 15-year-old at point-blank range in her head in a fit of rage, correct? Well, I don't know about the fit of rage. I would assume that's true. Oh, well. Okay. I would assume that's true. Yes, it's egregious. You know, I'm not saying my client did something good here, far from it. But I'm not saying it's first-degree murder. I mean, he took the stand and said this was an accident. What I'm suggesting is that because of what the prosecutor did, and also because of the judge denying the curative instructions, and one was requested as to the disparaging remarks about defense counsel, and that was denied. Well, he sustained – the judge sustained most, if not all, of the objections that the defense counsel made to these comments that were being made by the prosecutor, did he not? That's correct. That's correct. But when it came to give a curative instruction in both instances of misconduct, the defense request was denied. And so I can't say in my own mind, oh, well, it didn't make any difference. You know, I would have found this guy guilty of first-degree murder. His defense was that it was an accident, and I don't think that the jury was given this defense properly. But I don't know. Well, you've made a good argument. But, you know, we're given a very limited power to correct errors by a State court, and we've got to show that it's contrary to some Supreme Court opinion. What's the – what would be the binding opinion in your mind that would compel reversal? I don't remember the name of the case, but the language is that the prosecutorial misconduct must be sufficiently egregious to deny due process. I see I've run out of time. All right. Thank you. Thank you, Your Honors. Good morning, Your Honors. May it please the Court, Deputy Attorney General Amanda Carey appearing on behalf of the Respondent, the Warden. And as to the first claim of prosecutorial misconduct, as Appellant has pointed  out, this claim is governed by ADPA, and as such, review is limited to whether or not the State court's determination that these remarks did not constitute prejudicial misconduct was reasonable in light of controlling United States Supreme Court authority. And it is Respondent's position that it was reasonable. And the State court concluded in this case in regards to the statements that the prosecutor made about Appellant in possession of a firearm and how that affected whether or not he could be convicted of involuntary manslaughter, that taken as a whole and read in context, the prosecutor's statements actually were not a misstatement of the law. And Appellant has himself pointed out that, as the State court did, that the prosecutor never said that the fact that the mere fact that Appellant was a felon, an ex-felon and was in possession of a firearm at the time, that that was an inherently dangerous felony that would, as a matter of law, preclude the jury to find him guilty of involuntary manslaughter. And therefore, it's just not unreasonable when read as a whole and taken in context for the court to have found that these were not misstatements of the law and that the prosecutor was simply urging the jury to view Appellant's actions as a whole and to that his actions as a whole showed intent and did not support his theory of accident. Kagan. Well, wasn't there a pretty good argument that the prosecutor was manipulating or attempting to manipulate the evidence or, especially in light of all these other mistakes and statements that the prosecutor made? Are you referring to including all of the other additional claims of misconduct? Yes. How do we give the prosecutor the benefit of the doubt here in light of the record? Because as the State court determined that read in context and in light of the record as a whole and also in light of the substantial evidence supporting the jury's guilty verdict in this case, that even if we, which it's not Respondent's position that there was misconduct and the State court didn't find such, but even assuming there was, that he was not deprived of a fair trial after he was convicted of the crime. Here. These statements were terrible that the prosecutor made. Yes? I don't dispute that they, as the State court found, you know, some may have been considered misconduct and some certainly boarded on the line of misconduct. Well. Or not misconduct. I shouldn't use those interchangeably as being improper statements to make. It seems that these statements are similar, if not worse, than those found to be sufficiently prejudicial to grant a writ in Bruno, which was pre-AEDPA, but still. And statements like this were also determined to be prejudicial in the Hine case. Is that correct? I mean, it seems like they're the same, if not worse. Well, I would urge this court to consider, as this court has just stated in Hine, this court indicated which what can be considered in determining whether or not a comment by a prosecutor rendered a trial unconstitutionally unfair. And those are whether the court misstated the evidence. This is at page 912 and 913 of Hine. Whether the judge admonished the jury to disregard the comment, whether the comments were invited by defense counsel, whether defense counsel had an adequate opportunity to rebut those comments, and also the weight of the evidence against them. And in this case, as to, I believe, yes, that the court did decline to give an instruction, a defense-crafted instruction as to this, the first issue regarding the being a felon in possession. However, the State court concluded that that was not required under State law. Such an instruction was, the trial court was not required to give it. And even looking at, you know, the remarks, and if you would want to assume that they were improper, the court reasonably concluded that it did not deprive them of a fair trial because the trial court did correctly instruct on all of the theories of both first-degree, second-degree murder, involuntary and voluntary manslaughter, and also instructed the jury that statements made by an attorney that are in conflict with the instructions as to the law by the trial court must be disregarded. And as the State court found, we assume that the jury followed these instructions. And I would also further like to note that, you know, the fact that the jury did find him guilty of first-degree premeditated murder and also found that he personally and intentionally shot the victim, in this case, Ms. Glover, it necessarily precludes a finding of involuntary manslaughter in this case because involuntary manslaughter requires no intent to harm. And if the jury, concluding beyond a reasonable doubt that he was guilty of first-degree murder, it's necessary to find that he intended to kill Ms. Glover. And the jury was not even ---- Kagan. That's what perplexes me here, I mean, because the argument is there was no issue that infected the rest of the trial, and that means that your case was strong. Correct. Well, if it was so strong, why did the prosecutor do what it did? I mean, calling the defense attorney dishonorable, calling into question, not more than calling into question, but, you know, suspect how the witnesses' statements came out for the defense. I mean, this is beyond the pale. Well, Your Honor, I cannot speak to, you know, what the prosecutor was thinking in making these comments. But you're now speaking to it, and you have to defend it. Yes. And I have to defend it in the context of whether the State court's decision or finding that these remarks that were made by the prosecutor did not rise to the level of being so egregious as to deny the defendant his right to due process, that whether or not that was unreasonable or not in light of controlling United States Supreme Court authority. Even under Darden? Correct. Which would be the controlling authority in this case. Even under Darden, looking at these comments in the context of the entire trial and considering all of everything that the court should properly consider as to whether the trial court correctly instructed on all of the theories, the weight of the evidence against appellant, which was heavy in this case, as the State court pointed out. Do you agree it was incorrect or wrong for the government counsel to tell the jury that the defense counsel had convinced witnesses to change their testimony? I would agree that statements to that effect, essentially, you know, indicating that the defense counsel lied or, you know, fabricated stories for these witnesses to tell, would not be proper statements to make. However, viewed and if read in context of the entire closing argument, which these statements are taken out of, they simply read in context, as the State court found reasonably, it did not so much indicate that the prosecutor's focus was not really on the actions of defense counsel, but was more on focusing the jury on the discrepancies between the witnesses' statements. The statements that were made shortly after the crime occurred to police, which mentioned nothing of an accident, and then their statements that were made at trial while they testified, which seemed to indicate that it was an accident and completely differed from the previous statements. But by saying that because the defense counsel didn't record his interviews with these witnesses, do you think that was correct or do you think that was right for the government's counsel to do that? Well, I believe what the government, what the prosecutor in this case was doing, and maybe he could have found a better way to do it, was, and as I think the State court found, that he was, what he was really getting at was that it was a question for the jury to determine the credibility of these witnesses. And what the prosecutor kept pointing out was that the lack of any recording of these interviews with defense counsel simply meant that we don't have, the jury didn't have anything to compare to. All they could compare was the first. Was that correct for this government's counsel to do? Have you ever done that? I mean, was that correct for this government's counsel to do? I mean, I cannot say that I have ever done it. The trial court said it was incorrect. They instructed the jury. The trial court did instruct the jury that there was no, that it could only consider the, you know, that these interviews were not recorded to determine credibility, which is what the State court found the prosecutor was really getting at in making these comments and also explicitly told, and this was in response to the defense's request for an instruction, explicitly told the jury that defense counsel's integrity was not in question here, that he, just like the prosecutor, were, you know, their integrity was not in question. But the trial court was forced to do that because of the government's counsel's statement suggesting, if not stating, that the defense attorney was dishonorable. Correct? The trial court felt that that was, you know, a necessary action to take or at least that it was a precautionary action to take in order to alleviate any potential harm that might have flown from, you know, flowed from those statements. I guess I'm just struck by the type of statements, the egregious nature of them and the number of them, and just wanted you to be able to respond to them. I'm sorry it's you and not the lawyer who is down below who is having to do this. Yes, and I mean, you know, and I have to say, like, looking at them when you pick out each of these statements and, you know, stick them right next to each other, you get it, I read it. I thought in context, but it still seems. You say the case was strong, but I look at it. He had no motive to kill the girl. Why? I mean, first-degree murder requires intent. So what intent did he have to kill her? Well, his intent in this case was evidenced by his actions, and I had to back his statements that he intended to kill either Glover, who was the ultimate victim. Well, it's obvious that he was sputtering and he was angry they had taken the car, but is there really any evidence of intent to kill her? Well, as the State Court found, there were multiple people who testified that he made various statements prior to Vickerman and Glover arriving back at the house with the car indicating that he was going to kill them, and he walked out with a gun in his hand waiting for them to arrive, and as soon as they did, he began yelling and cursing at them and pointing the gun at them, ultimately shooting Glover at nearly point-blank range in the temple. Well, I think it's clear he was mad at the guy who took the car, but either. What's the strongest statement that he intended to kill Glover? Well, I believe it was the statement, and don't quote me on this, it was something to the effect of, in part of my language, I'm going to kill the bitch. And I know there was some potentially confusion as to who he was referencing, either Glover or Vickerman, but it doesn't really matter in this case because the transferred intent would cover no matter who he was referring to in that situation. And then all of his actions after making those statements and up until the shooting itself evidenced his intent that he was intent on killing her or Vickerman, and again, transferred intent would cover that. And at any given point in time, he could have reversed those actions that ultimately led up to what happened here, and he didn't. And the State court was reasonable in concluding that that evidence carried great weight and it was strong, and the jury ultimately concluded that there was no accident, that it was actually an intent to kill, premeditated and deliberate intent in this case. And ---- I had three questions I wanted to ask relating to the records. Okay. If you're able to answer them, I'm not expecting you to be able to. The first question is, did the trial court pre-instruct during jury selection that the law applicable in this case is solely within the power of the court, not what the attorneys say? You know, I am not ---- I cannot say for sure whether the court pre-instructed on that. All I can say is that the court did instruct with CALJIC 0.50 in that if the attorney's comments regarding the law conflict with the trial court's instructions on the law, that the attorney's statements are to be disregarded. And I believe ---- I don't remember which numbered instruction it was, but the court also instructed that what the attorneys say is not evidence and should not be treated as such. Now, did the trial court give its final instructions to the jury regarding the applicable law after or before closing arguments by counsel? You know, I'm not positive. I believe it was ---- and maybe Mr. Weed can assist in that question in his rebuttal. I believe that they instructed prior to the closing. That's my recollection, but, again, I can't ---- I'm not 100 percent sure on that. Okay. And the third question, was Easter given a copy of the jury instructions for her or his use during deliberations? And, again, I'm not ---- I'm not positive. I mean, I believe that a packet was sent with them into the deliberation room. I cannot be sure if each one was given an individual copy. Okay. Thank you. Thank you. Unless there are further questions, I think I'm almost out of time. You are out of time. Thank you. Your Honor, I'll submit it unless the Court has further questions. All right. Thank you. Thank you. The case will be submitted. We're ready to ---- thank you all very much.
judges: Timlin, Noonan, Murguia